IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH FACEBOOK ACCOUNT
ASSOCIATED WITH TELEPHONE
NUMBER +19788284247 THAT IS
STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC.

No. 20-mj-193-01-AJ

**[UNDER SEAL]**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Joseph DeWitt being first duly sworn, hereby depose
and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant
for information associated with a certain Facebook account that is stored at
premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"),
a social networking company headquartered in Menlo Park, California.  The
information to be searched is described in the following paragraphs and in
Attachment A.  This affidavit is made in support of an application for a search
warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require
Facebook to disclose to the government records and other information in its
possession, pertaining to the subscriber or customer associated with the referenced
telephone number.

2.      I am a police officer employed by the Nashua Police Department (NPD)

since 2009. In September 2018, I transferred to NPD's Narcotics Intelligence

Division, where I conducted investigations into narcotics-related offenses. Since

September 2019, I have served as a Task Force Officer (TFO) to the Drug

Enforcement Administration (DEA) Strike Force, Manchester, New Hampshire

District Office. I have attended narcotics and criminal investigation training classes

put on by the New Hampshire Police Standards and Training Council, the DEA, the

Northeast Counterdrug Training Center, as well as by the NPD.

3.      As a DEA TFO, I am authorized to investigate violations of the laws of

the United States, including violations of the federal drug laws and money

laundering laws in Title 21 and Title 18, respectively, of the United States Code. I

am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing

the criminal laws and duly authorized by the Attorney General to request a search

warrant.

4.      Through my training, education, and experience, I have become

generally familiar with the manner in which drug trafficking organizations

("DTOs") conduct their illegal activities, including purchasing, manufacturing,

storing, and distributing narcotics, the laundering of illegal proceeds, and the

efforts of persons involved in such activity to avoid detection by law enforcement.  I

have participated in the execution of numerous search warrants resulting in the

seizure of large quantities of controlled substances and paraphernalia involved in

the manufacture and distribution of controlled substances; United States currency,

2

records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.

5.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers.  I am aware that narcotics traffickers commonly use cellular telephones in furtherance of their trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am also aware that some narcotics traffickers utilize other means of electronic communication – including the Facebook messenger application – in support of their trafficking.  I am also aware that narcotics traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection.

6.      I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

        a.  my experience investigating drug-trafficking offenses;

3

b.   oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

c.   discussions I have had personally concerning this investigation with experienced narcotics investigators;

d.   physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e.   public records and law enforcement databases;

f.   Title III intercepts of wire and electronic communication;

g.   telephone toll records, pen register and trap and trace information, and telephone subscriber information;

h.   geolocation information; and

i.   conclusions based on interpretations of conversations and text messages intercepted pursuant to court-authorized interception of wire and/or electronic communications made by me and other experienced law enforcement agents.

7.   Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers and Spanish-language interpreters.  When information is based on my personal knowledge or conclusion, it will be so stated.

4

8.     Conversations and discussions below are set forth in substance only unless noted otherwise. Dates, times, and amounts are approximate. Because many conversations discussed below occurred in Spanish, I have included preliminary translations provided to me by agents or interpreters fluent in both English and Spanish.  Any statements excerpted from intercepted communications, including those that are translated and quoted herein, are subject to further revision.

9.     Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

10.     Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) have been committed, are being committed, and will be committed by DELACRUZ-DIAZ and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## **PROBABLE CAUSE**

11.     Since the spring of 2019, the DEA has been conducting an investigation of a drug trafficking organization (DTO) led by Luis ARAUJO-GUERRERO.  In furtherance of this investigation, on March 13, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of two telephones held by ARAUJO-GUERRERO.  Based upon information obtained from a variety of sources, including confidential sources, cell phone location information, physical surveillance, and the Title III intercepts, agents learned that ARAUJO-GUERRERO was being supplied narcotics by VALDEZ-AYBAR, as well as by his brother, Santo Araujo-Guerrero Jr. a.k.a. Belky ("BELKY").

12.     On August 25, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of  telephones held by VALDEZ-AYBAR and BELKY.  During this interception period, agents identified DELACRUZ-DIAZ as a source of drug supply for VALDEZ-AYBAR, and agents later learned that **TT-6** was a telephone that was being used by DELACRUZ-DIAZ. Agents also intercepted several conversations between BELKY and VALDEZ-AYBAR, and through these conversations identified **TT-7** as a telephone used by VALDEZ-AYBAR to coordinate drug purchases.

13.     Agents first intercepted DELACRUZ-DIAZ during interceptions of a phone used by VALDEZ-AYBAR on August 26, 2020.  DELACRUZ-DIAZ and VALDEZ-AYBAR arranged to meet up.  The next day, August 27, 2020,

6

DELACRUZ-DIAZ was intercepted offering VALDEZ-AYBAR a kilogram of sealed cocaine.

14.     On October 20, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of **TT-6** and **TT-7**, and agents are currently intercepting wire and electronic communications on the two numbers for a 30-day period.  To date, agents have intercepted numerous conversations related to drug trafficking on **TT-6** and **TT-7**.

15.     With respect to DELACRUZ-DIAZ, on October 21, 2020, at approximately 9:35 a.m., in Session 34, DELACRUZ-DIAZ made an outgoing call on **TT-6** to (978) 483-9034, and spoke with an unknown Spanish speaking male (UM9034). The following is an English translation of their Spanish-language conversation:

| | |
|---|---|
| **UM9034**: | Hello. |
| **DELACRUZ**: | What's up? |
| **UM9034**: | Talk to me. |
| **DELACRUZ**: | Have everything ready, okay? |
| **UM9034**: | Okay. |
| **DELACRUZ**: | I am going to pick (ph) that up, okay? |
| **UM9034**: | Yes. |
| **DELACRUZ:** | Okay…. |

16.     Directly following this call, at 9:37 a.m., in Session 35, DELACRUZ-DIAZ made an outgoing call over **TT-6** to (978) 242-5801, and spoke with an unknown Spanish speaking female (UF5801).  During this call, DELACRUZ-DIAZ told UF5801 that he needed a ride, and UF5801 told DELACRUZ-DIAZ she would

pick him up after she showered.

17.     After ending the call with UF5801, at 9:41 a.m., in Session 36, DELACRUZ-DIAZ received an incoming call from UM9034, and had the following conversation:

| | |
|---|---|
| **DELACRUZ**: | Talk to me sonny. |
| **UM9034**: | I don't have "pulgas" (ticks) here or smalls. |
| **DELACRUZ**: | Alright I am in my house, I will get them for you.  I will call the cab to come get me. |
| **UM9034**: | Alright. |
| **DELACRUZ**: | Okay. |

Based on this series of conversations, I believe that when DELACRUZ-DIAZ told UM9034 "I am going to pick (ph) that up, okay?" DELACRUZ-DIAZ was telling UM9034 that he was going to pick up a quantity of drugs.  I believe that DELACRUZ-DIAZ then coordinated a ride with UF5801 to pick up the drugs, and then called UM9034 again to tell him that he was leaving shortly.  During this conversation, UM9034 told DELACRUZ-DIAZ, "I don't have "pulgas" (ticks) here or smalls," which I believe was a reference to a quantity of drugs that UM9034 sells.  I believe that after this statement by UM9034, DELACRUZ-DIAZ agreed to get the quantity of drugs for UM9034.

18.     Shortly following the above call, at 9:48 a.m., Session 37, DELACRUZ-DIAZ received an incoming call on TT-6 from UM9034, and had the following conversation:

| | |
|---|---|
| **DELACRUZ**: | Talk to me. |
| **UM9034**: | You know, when you…hide [Ph] that so you don't come with anything on hand, okay? |

**DELACRUZ**:                    I know, hide that. I know.

Based on this conversation, I believe that UM9034 called DELACRUZ-DIAZ, and told him to hide the drugs, so that he would not have the drugs in his hand when he arrived at UM9034's location. I believe DELACRUZ-DIAZ acknowledged this, and told UM9034 he knew to hide the drugs.

19.    At approximately 10:04 a.m., Session 38, DELACRUZ-DIAZ made an outgoing call to UF5801, and UF5801 told him that she was almost to his location. At approximately 10:10 a.m., I was conducting fixed camera surveillance of 344 Lowell Street, and observed DELACRUZ-DIAZ exit the driveway, get into a blue Honda Odyssey van and drive from the area. At around this same time, DELACRUZ-DIAZ again spoke with UM9034 and told him he was in a taxi and would be there soon. Based on these conversations and observations, I believe that DELACRUZ-DIAZ left 344 Lowell Street, and travelled to UM9034's location to supply him with drugs.

20.    At approximately 10:22 a.m., Session 40, DELACRUZ-DIAZ made an outgoing call to UM9034, and told UM9034, "I am almost there, have everything ready to fix now." UM9034 acknowledged, and DELACRUZ-DIAZ then told him, "The rest [ph], okay?" UM9034 then told DELACRUZ-DIAZ, "Alright. Everything is ready already." Based on this conversation, I believe DELACRUZ-DIAZ told UM9034 that he was almost to his location, and that UM9034 needed to get things ready to "fix". I believe that DELACRUZ-DIAZ was telling UM9034 to get things ready, so that the drugs could be mixed with diluents.

9

21.    As a further example, on October 21, 2020 at approximately 5:10 p.m., Session 124, DELACRUZ-DIAZ received an incoming call on **TT-6** from (978) 566-4234, and spoke with an unknown Spanish speaking male (UM4234).  The two had the following conversation:

| | |
|---|---|
| **DELACRUZ**: | What's up? |
| **UM4234**: | I have the 4.5 of the 10 that you passed out. |
| **DELACRUZ**: | You have them? |
| **UM4234**: | Yes, the 4.5 of the 10 that I grabbed from you yesterday. |
| **DELACRUZ**: | Oh, do you want anything? |
| **UM4234**: | Uhm, I have some there but I am waiting to finish, so you get me?  So, I order the rest or if you want, bring me the rest, whatever you want. |
| **DELACRUZ**: | So, I am going to bring it to you. You heard? |
| **UM4234**: | What time? |
| **DELACRUZ**: | I am calling the taxi, now.  Wait for me. Wait for me. |
| **UM4234**: | I'm heading there, it is alright. |
| **DELACRUZ**: | Oh, you are there? |
| **UM4234**: | No, to the house. No, I am not there, no. |
| **DELACRUZ**: | Alright, head then to the house. |
| **UM4234**: | Alright |
| **DELACRUZ**: | Alright. |

22.    Based on this conversation, I believe that when UM4234 told DELACRUZ-DIAZ, "I have the 4.5 of the 10 that you passed out," UM4234 was telling DELACRUZ-DIAZ that he had sold some of the drugs that DELACRUZ-DIAZ had provided him with, but still had 4.5 units left.  I believe that DELACRUZ-DIAZ then asked UM4234 if he wanted more product, and UM4234 explained that

10

he had not sold  all of the drugs that he had, but would let DELACRUZ-DIAZ decide

if he wanted to bring him more product.  Later in the evening at 6:00 p.m., Session

129, DELACRUZ-DIAZ called UM4234, and told UM4234 that he was "almost

there."  Based on this conversation, I believe that DELACRUZ-DIAZ delivered more

drugs to UM4234.

23.    On October 22, 2020, at approximately 4:58 p.m., in Session 206,

DELACRUZ-DIAZ made an outgoing call on **TT-6** to the (404) 409-9012 ("**9012**

**Telephone**"), and spoke with an unknown Spanish speaking male ("UM9012"). The

following is an English translation of their Spanish-language conversation:

| | |
|---|---|
| **UM9012**: | Hello. |
| **DELACRUZ**: | Check out how much they will charge. I have a cousin who can buy everything they give you. |
| **UM9012**: | Let me ask. |
| **DELACRUZ**: | Two, three…whatever they have. Even if they have 10 with the money upfront. |
| **UM9012**: | I am asking him and he has not said how much he's selling it for. |
| **DELACRUZ**: | Check and see. It's with money. |
| **UM9012**: | Ok. |

24.    In the next communication over **TT-6**, at 8:46 p.m., in Session 239,

DELACRUZ-DIAZ made an outgoing text over **TT-6** to the **9012 Telephone**, and

stated, "They are not expensive."  It is unknown whether or not DELACRUZ-DIAZ

had spoken to UM9012 using a different device or messaging service, but I believe

that he was referring to a price that UM9012 had communicated to him. I believe

that in the previous conversation, DELACRUZ-DIAZ was looking for a quantity of drugs. I believe that he was saying that he was willing to purchase the drugs and pay for them in cash. UM9012 indicated that he did not know the price that the unknown third party was charging, but I believe that UM9012 was going to find the price out for DELACRUZ-DIAZ and report back.

25.     Since interceptions have begun over **TT-6**, DELACRUZ-DIAZ has shown an interest in locating bulk quantities of drugs for purchase. I believe that due to the Coronavirus related border shut downs, it has been difficult for DELACRUZ-DIAZ to locate bulk cocaine and fentanyl. In the previous call, DELACRUZ-DIAZ made it abundantly clear that he was willing to pay, in cash, for any amount that was available. In the ensuing calls with UM6578, he made similar statements, reiterating his need for bulk drugs from whatever source has them.

26.     On October 21, 2020, at approximately 10:43 a.m., Session 47, DELACRUZ-DIAZ received an incoming call from (862) 668-6578 ("**6578 Telephone**"), and spoke with an unknown Spanish speaking male ("UM6578"). The two had a conversation about drugs that DELACRUZ-DIAZ currently had and also future drug related business between each other. The following is a portion of the conversation:

| | |
|---|---|
| **UM6578**: | Listen Manny. So you are not doing anything with those buttons? I though you already had the people man. |
| **DELACRUZ**: | I have to tell you the truth. I really cannot tell you something without having those people because then I'll have that just sitting here you know? |

12

| | |
|---|---|
| **UM6578**: | Right, right. Well, I thought that earlier since you had asked me… |
| **DELACRUZ**: | The originals yes. All the originals will sell out, all the originals they they bring. Five, Ten, Fifteen, Twenty, But not a good copy. That is difficult. |
| **UM6578**: | Yes Yes. |
| **DELACRUZ**: | I don't have those people. |
| **UM6578**: | Hey people pay a lot for those originals. Here I have… |

Based on this conversation, I believe that when UM6578 asked DELACRUZ-DIAZ about "the buttons" that he was referring to drugs. In my experience, drug traffickers in the New England area refer to Percocet Pills as "buttons." I believe that in this instance, UM6578 believed DELACRUZ-DIAZ could sell "buttons" for him, but DELACRUZ-DIAZ had not ordered any from him. I believe that DELACRUZ-DIAZ negated and said that he doesn't have the customers and that if he took the buttons, they would just "sit there" because he had no one to sell them to. I believe that when DELACRUZ-DIAZ referred to "the originals," that he was talking about uncut kilogram amounts of cocaine or fentanyl. I believe that he was saying he would buy five, ten, fifteen and even 20 kilograms of cocaine or fentanyl, if it were uncut or as he said, "original." I believe this because in past intercepts between him and VALDEZ-AYBAR, DELACRUZ-DIAZ has been heard discussing "originals" when referring to an uncut kilogram of cocaine. I believe that in this instance, DELACRUZ-DIAZ was telling UM6578 that he is interested in the "originals" but not the buttons.

27.    On October 22, 2020, at approximately 5:45 p.m., Session 215,

DELACRUZ-DIAZ received an incoming call on **TT-6** from the **6578 Telephone**, and spoke with UM6578.  The two then had a conversation related to a drug arrangement, and the following is a segment of that conversation:

| | |
|---|---|
| **UM6578**: | Listen to me clearly, I already received that. |
| **DELACRUZ**: | mhh-hm. |
| **UM6578**: | I told his dad, "oh that little thing." He's like, "Yes, yes." I'm like, "Hey you can even call me by camera right now so you can see." Everything is under control. Thank god. |
| **DELACRUZ**: | Yea |
| **UM6578**: | Because I know how to get things done |
| **DELACRUZ:** | Alright man, but it's that… I don't say otherwise |
| **UM6578**: | Manny! Manny, you don't have 300? You cannot be like that. |
| **DELACRUZ:** | I am going to give it to him. But the thing is, like you say, that sometimes… |
| **UM6578**: | Manny my question is…you don't have 300 dollars? |
| **DELACRUZ:** | 300 pesos is nothing. I'm telling you that I'm going to give it to him. But what I am trying to say is…it's like you say. What do you tell me all the time? Sometimes it's not about 300 or 100 pesos or 1000 pesos, it's about the fact of lying about doing something. You get me? |
| **UM6578**: | Well, let's think it through papi please. I cannot call you a liar, because sometimes you are so busy and you don't have time for me or anybody. |
| **DELACRUZ:** | That's fine, I will give it to him and him. I will take care of Calvo. Don't worry I'll give it to him. |
| **UM6578**: | But I don't want…No, that not between you and Calvo….its between you and I, because |

I'm very responsible. But I'm going to tell you something that makes sense. Sometimes you have been so busy that you don't have time for anybody. And a person cannot, even more something like that. Now, if he had given me a grace of a couple of days and not how we agreed on what I ended up receiving, then I would agree with you. But you need to do the math and be smart. Say to yourself "If this person handed him right now, 10 of the good ones. I cannot...Calvo" Come on man, think about it.

**DELACRUZ**:        That I can understand my love, don't worry.

**UM6578**:        Thanks for the love

**DELACRUZ**:        One question...when will you be receiving the next work?

**UM6578**:        Listen man,that just arrived today. I have the confirmation here. The tickets got delayed due to coronavirus. But there is not going to be any more delays now. Let me tell you why, because they are going to have their own trucks. The construction will always be active. I already talked to him...I said to him clearly, "I need the office to be stocked, to have the inventory there."

28.     Based on this conversation, I believe UM6578 called DELACRUZ-

DIAZ to talk about a recent drug shipment that he and DELACRUZ-DIAZ had been

involved in. I believe that DELACRUZ-DIAZ had a disagreement with an associate

named "Calvo" and paying him $300 for an unknown service. I believe that

DELACRUZ-DIAZ then asked UM6578 when the next drug shipment was coming

when he asked, "When will you be receiving the next work." I believe that UM6578

told him that he already had it and that his associates will "have their own trucks."

I believe that in this statement UM6578 is referring to the transportation of the

bulk drugs. I believe that when UM6578 stated, "I need the office to be stocked, to have inventory there," that he was referring to his bulk drug inventory at an unknown stash house location.  Based on the above, and the fact that DELACRUZ-DIAZ does not appear to be gainfully employed or have a source of income aside from drug trafficking, I believe his conversations with the **9012 Telephone** and **6578 Telephone** are clearly in regards to furthering his drug dealing operations.

29.     In my training and experience, I know that drug traffickers utilize multiple different messaging services in order to carry out their day to day drug operations. I also have conducted investigations where drug orders were placed to the drug trafficker through Facebook messenger.  I know that DELACRUZ-DIAZ previously had a Facebook account which was listed under account number 100007945579324. But, recently it was discovered that this account had been deleted. Furthermore, am aware that several of DELACRUZ-DIAZ's drug associates use and maintain Facebook accounts, to include VALDEZ-AYBAR.

30.     However, during recent Title III intercepts over **TT-6**, which is used by DELACRUZ-DIAZ, I have seen at least three messages from Facebook that indicate DELACRUZ-DIAZ has an active Facebook Account. For instance, on October 21, 2020, at approximately 6:34 a.m., **TT-6** received a text that read "951104 is your initial session code for Facebook." I have seen messages similar to this on October 23, and October 25, 2020. I know that Facebook provides users with the ability to use two-factor authentication when logging into their account. This is usually a password and a random six-digit number that is generated by Facebook and sent to

16

the telephone that is linked to the user's specific account. This added security measure prevents unauthorized access in the event that your password is compromised.

31.     Throughout this investigation, I have identified that DELACRUZ-DIAZ used up to three telephones at a time, as well as separate WhatsApp messaging accounts on each telephone. Since the current intercept began, agents have overheard multiple calls where DELACRUZ-DIAZ or his contacts indicate that they are sending photographs and other drug related information using another method other than normal SMS messages, which would be intercepted. For instance, on October 21, 2020, at approximately 10:36 a.m., DELACRUZ-DIAZ had contact with an unknown female that he refers to as Sandra in other calls:

| | |
|---|---|
| **SANDRA**: | Do you read your messages? |
| **DELACRUZ-DIAZ**: | Yes, I am going to call you. I can't (U/I) im working. Bring him the picture please and the passport. That guy Caico is calling me buddy |
| **SANDRA**: | Okay |

32.     Based on this aforementioned call, I believe that DELACRUZ-DIAZ utilizes third-party messaging apps in order to communicate specific drug conduct with his co-conspirators. In this instance, no messages were intercepted over **TT-6** from SANDRA. In a subsequent phone call, DELACRUZ-DIAZ and SANDRA discuss the message in detail:

| | |
|---|---|
| **DELACRUZ-DIAZ**: | I just sent you a whatsapp to send Alex's number to here, so that Caico calls and he can hand it over right now on my behalf. |
| **SANDRA**: | But don't have Alex's number there? |

17

| | |
|---|---|
| **DELACRUZ-DIAZ**: | I have it dear, but I have it on the iphone. |
| **SANDRA**: | OK |
| **DELACRUZ-DIAZ**: | And I don't have Caico on that other one. |
| **SANDRA**: | Oh, I will send it to you |
| **DELACRUZ-DIAZ**: | Send it to me |

33.     While this conversation indicated that the messages occurred over WhatsApp, I believe that it demonstrates how much DELACRUZ-DIAZ is compartmentalizing his drug operation between multiple telephones and multiple messaging platforms. I know that based upon the two-factor authentication messages sent from Facebook to TT-6, that during the course of his drug operation, DELACRUZ-DIAZ has attempted to access his Facebook account, which I believe could be to communicate to his co-conspirators.

34.     I also know that DELACRUZ-DIAZ has had conversations with another co-conspirator, John Albeiro PARADA-RAMIREZ.  PARADA-RAMIREZ is believed to be a Dominican National currently living in the Sinaloa, MX area.  He has been intercepted on multiple occasions discussing drug related activity with DELACRUZ-DIAZ.  But, as was the case with his aforementioned conversations, other messaging applications are being used in conjunctions with these calls.  For instance, on October 22, 2020, at approximately 7:30 p.m., DELACRUZ-DIAZ received a call from PARADA-RAMIREZ:

| | |
|---|---|
| **PARADA-RAMIREZ**: | Dude, did you not read the messages I sent you? |
| **DELACRUZ-DIAZ**: | Tell me whats up? |
| **PARADA-RAMIREZ**: | I send you some messages and… |
| **DELCRUZ-DIAZ**: | Hold on a second (Call disconnects) |

18

Based on this conversation, I believe that PARADA sent messages to DELACRUZ-DIAZ, however, no messages were intercepted over **TT-6**. PARADA-RAMIREZ and DELACRUZ-DIAZ continued their conversation shortly after:

| | |
|---|---|
| **PARADA-RAMIREZ**: | You are a tough guy, alright. You don't answer the phone. |
| **DELACRUZ**: | They left me the... The receipt is there, we just have to check. |
| **PARADA-RAMIREZ**: | There is nothing to check. I don't know why you beat around the bush. If you could not do it, you should have said so. |
| **DELACRUZ-DIAZ**: | Either way they already exchange it. I was at the nightclub. Either way they exchanged it for you. |
| **PARADA-RAMIREZ**: | Where is the receipt? |
| **DELACRUZ-DIAZ**: | The receipt is here... on my other phone. |
| **PARADA-RAMIREZ**: | I sent you the name of who it was going to be sent under and you don't respond. All you want to do is be at the fucking barbershop. |
| **DELACRUZ-DIAZ**: | Which barbershop? I'm at the nightclub. What fucking barbershop? |
| **PARADA-RAMIREZ**: | I asked you if you were going to exchange that, and I called you and you don't answer. I sent you the name. |
| **DELACRUZ-DIAZ**: | Let me check. |

35.    I believe that this conversation between PARADA-RAMIREZ and DELACRUZ-DIAZ was related to a money transaction that DELACRUZ-DIAZ was supposed to be dealing with. In this call, PARADA-RAMIREZ again indicated that he sent messages to DELACRUZ-DIAZ but no texts were intercepted from PARADA-RAMIREZ during this time period.  Furthermore, a review of the court ordered WhatsApp PEN on **TT-6** showed no contact with any numbers believed to

be associated with PARADA-RAMIREZ for several hours prior to the above conversation with DELACRUZ-DIAZ. I know that Facebook has the same capability to send and receive messages and that drug traffickers believe that these messages are encrypted.

36.    Since interceptions on **TT-6** began on October 21, 2020, agents have discovered that the phone is being used almost exclusively for running DELACRUZ-DIAZ's drug operation. In my experience, drug traffickers often utilize specific telephones solely for the drug related conduct. Although I have not observed any specific instances of DELACRUZ-DIAZ referring to Facebook during his drug related conversations, I know that **TT-6** is directly linked to his Facebook account, based upon the two-factor authentication messages from Facebook to **TT-6**. Based on the majority of his conduct on **TT-6** being directly related to drug trafficking, I also believe that DELACRUZ-DIAZ's Facebook use on this telephone will also have direct connections to his DTO.  I know in my investigative experience that drug traffickers often "friend" other co-conspirators and take photographs and post them to their Facebook accounts. I also believe that this search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to make contact with drug customers through Facebook. In my experience, traffickers believe they will be safer if they look into a potential customer's social media presence prior to meeting face to face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

20

37.     A preservation request was served on Facebook for the account

associated with **TT-6,** on October 23, 2020.  Facebook has indicated that it has

taken reasonable steps to preserve this account.

38.     Facebook owns and operates a free-access social networking website of

the same name that can be accessed at http://www.facebook.com.  Facebook allows

its users to establish accounts with Facebook, and users can then use their accounts

to share written news, photographs, videos, and other information with other

Facebook users, and sometimes with the general public.

39.     Facebook asks users to provide basic contact and personal identifying

information to Facebook, either during the registration process or thereafter.  This

information may include the user's full name, birth date, gender, contact e-mail

addresses, Facebook passwords, physical address (including city, state, and zip

code), telephone numbers, screen names, websites, and other personal identifiers.

Facebook also assigns a user identification number to each account.

40.     Facebook users may join one or more groups or networks to connect

and interact with other users who are members of the same group or network.

Facebook assigns a group identification number to each group.  A Facebook user can

also connect directly with individual Facebook users by sending each user a "Friend

Request."  If the recipient of a "Friend Request" accepts the request, then the two

users will become "Friends" for purposes of Facebook and can exchange

communications or view information about each other.  Each Facebook user's

account includes a list of that user's "Friends" and a "News Feed," which highlights

21

information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42.   Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

43.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook)

23

websites.  Facebook users can also become "fans" of particular Facebook pages.

47.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

48.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

50.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

51.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would

reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

52.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

53.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such

as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account

access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55.     I anticipate executing this warrant under the Electronic

Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), by using the warrant to require Facebook to disclose to the

government copies of the records and other information (including the content of

communications) particularly described in Section I of Attachment B.  Upon receipt

of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of

Attachment B.

## CONCLUSION

56.     Based on the forgoing, I request that the Court issue the

proposed search warrant.

57.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement

officer is not required for the service or execution of this warrant.  The government

will execute this warrant by serving it on Facebook.  Because the warrant will be

served on Facebook, who will then compile the requested records at a time

convenient to it, reasonable cause exists to permit the execution of the requested

warrant at any time in the day or night.

58.     This Court has jurisdiction to issue the requested warrant because it is

"a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3).  18 U.S.C.

§§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the

United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

I declare that the foregoing is true and correct.


/s/ Joseph DeWitt
Joseph DeWitt, Task Force Officer
U.S. Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  **Oct 26, 2020**

Time: **5:34 PM, Oct 26, 2020**

HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

28

## ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Facebook account associated with telephone number +19788284247 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## Particular Things to be Seized

## I.     Information to be disclosed by Facebook

For the time period between August 26, 2020, and October 26, 2020, to the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

2

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

3

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) involving Manuel Emilio DELACRUZ-DIAZ since August 26, 2020, including, for each user identified on Attachment A, information pertaining to the following matters:

> (a) The unlawful acquisition, possession or distribution of controlled substances and the unlawful use of a communication facility;
>
> (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
>
> (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
>
> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).
>
> (e) The identity of person(s) who communicated with the user about matters relating to the acquisition, possession, or distribution of controlled substances.

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is _____.   I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ (pages/CDs/megabytes).  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____      _____
Date                                 Signature

2